UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____-cv-_____/_____

COMMODITIES & MINERALS
ENTERPRISE, LTD.,
  Plaintiff,

v.

CITIBANK, N.A.,
  Defendant.

_____/

FILED by _RAL_ D.C.

JUN 2 5 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## VERIFIED COMPLAINT AND EMERGENCY REQUEST FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

To preserve the status quo pending the completion of binding arbitration, Plaintiff Commodities and Minerals Enterprise, Ltd. ("CME"), time charterer of a vessel owned by non-party Gretchen Shipping, Inc. ("Gretchen") and/or Kyma Ship Management, Inc. ("Kyma"), seeks an ex parte emergency temporary restraining order and/or emergency preliminary injunction against Defendant Citibank, N.A., to prevent drawdown of a $2.5 million irrevocable standby letter of credit by the beneficiary Gretchen/Kyma until final resolution of arbitration by CME against Gretchen/Kyma in the Society of Maritime Arbitrators, Inc. ("SMA"), wherein CME seeks to rescind or cancel the charter and recover damages caused by recurring material failures and breakdowns of the vessel.

Without emergency injunctive relief, Gretchen/KYMA will sidestep the binding arbitration clause in the charter and drawdown the letter of credit without notice before the arbitration panel convenes, causing irreparable harm to CME.

*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A.,*
Case No. _____-cv-_____/_____

Moreover, an emergency restraining order and/or injunction is proper where Gretchen/Kyma committed material fraud prior to and during the charter by materially misrepresenting the vessel's condition and discharging capabilities, and concealing material defects that rendered the vessel unfit, unseaworthy, and incapable of performing its obligations under the charter. Accordingly, CME respectfully submits that an ex parte emergency temporary restraining order and/or preliminary injunction should be granted.

### Facts Supporting Emergency Injunctive Relief

1.    Commodities and Minerals Enterprise, Ltd. ("CME"), a British Virgin Islands entity, pursuant to a Time Charter dated January 25, 2010 ("Time Charter" or "Charter"), chartered the M/V General Piar ("General Piar" or "Vessel") from Gretchen Shipping, Inc. ("Gretchen"), a Liberian entity, c/o Kyma Ship Management, Inc. ("Kyma"), a Panamanian entity. *See Exhibit* A, Time Charter.

### Letter of Credit

2.    In accordance with Section 25 of the Charter, CME applied for a $2.5 million irrevocable standby letter of credit from Citibank, N.A. ("Citibank").

3.    In response to CME's application for a letter of credit pursuant to the Charter, Citibank issued Irrevocable Letter of Credit No. 63656745 ("Letter of Credit" or "LOC") on January 28, 2011, which automatically renewed without amendment for additional 1-year periods through 2015. *See Exhibit* B, Letter of Credit.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A.,*
*Case No. _____-cv-_____/ _____*

4.    The LOC was issued through Citibank's servicer, Citicorp North America, Inc., in Tampa, FL.  *See Exhibit* B, Letter of Credit.

5.    Under the terms of the LOC, Gretchen/Kyma is authorized to immediately drawdown from the LOC, without notice to CME, upon presenting to Citibank any of the following:  (a) a Gretchen invoice for charter hire marked unpaid, along with a signed certificate from Gretchen/Kyma; (b) an arbitration award against CME in favor of Gretchen, along with a signed certificate from Gretchen/Kyma; (c) a signed statement from Gretchen/Kyma that the LOC was not renewed; or (d) a signed statement from Gretchen certifying that the amount of the letter of credit was not reinstated following two consecutive draws.  *See Exhibit* B, Letter of Credit.

6.    CME has fully paid all Gretchen/Kyma invoices for charter hire due to date, even where CME paid under protest or disputed the amount of the invoice, including but not limited to numerous incidents where the General Piar suffered a material breakdown or failure that caused damages to CME.

7.    Accordingly, Gretchen/Kyma has no legitimate basis to trigger drawdown of the LOC, and any attempt by Gretchen/Kyma to do so would be fraudulent.

**Material Fraudulent Misrepresentations and Recurring Breakdowns**

8.    CME entered the 60-month Time Charter for the purpose of transporting thousands of tons of iron ore from Puerto Ordaz, in the mouth of the Orinoco River in Venezuela, to be discharged onto the offshore Boca Grande II Transfer Station, where the iron ore is later transferred to oceangoing export vessels that transport the ore to China.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

9.    The discharge rate of the General Piar was a material term of the Charter, particularly because the purpose of the Charter was to discharge iron ore onto a transfer station for export overseas.

10.    Prior to the Charter, as a material representation to induce CME to enter a 60-month charter of the Vessel, Gretchen/Kyma made written and oral statements misrepresenting that the discharge rate exceeded 3,000 tons per hour, and that the vessel could perform up to 4,500 metric tons per hour. *See Exhibit* C, e-mail from Katsoufis.

11.    Prior to the Charter, as a material representation to induce CME to enter a 60-month charter of the Vessel, Gretchen/Kyma misrepresented to CME that the General Piar could discharge at 3,000 tons per hour, in accordance with the Specifications of the Vessel. *See Exhibit* D, Specifications.[1]

12.    Relying upon these material misrepresentations from Gretchen/Kyma, CME entered into a 60-moth Charter, where the General Piar's discharge rate was a material term of the time charter, and the Specifications of the Vessel were incorporated into Charter implicitly and by reference. *See Exhibit* A, Time Charter.

13.    Gretchen/Kyma's representations of the discharge rate were completely false and were material misrepresentations made solely to fraudulently induce CME to enter into the Charter.

14.    Since the inception of the Charter, the General Piar has consistently failed to perform anywhere near the 3,000 ton per hour rate, and in fact has averaged

---

[1] Note that the attached Specifications reference the "Christopher Oldendorff," which is the prior name of the M/V General Piar.  For efficiency, all pleadings in this action will refer to the M/V General Piar.

approximately 1,000 metric tons per hour during discharge, causing CME to suffer recurring damages, losses, lost charter hire, among other expenses, costs, and liabilities.

15.   In addition to the chronic failure to meet the discharge rate obligations under the Charter, Gretchen/Kyma has failed to maintain the Vessel in a seaworthy state compliant with its obligations under the Charter, and failed remedy numerous mechanical, structural, and operational issues on the Vessel that have caused repeated breakdowns and failures.

16.   Therefore, Gretchen/Kyma fraudulently misrepresented the capabilities of the Vessel to CME, fraudulently induced CME to enter the Charter, continually misrepresented the Vessel's ongoing failures and structural and mechanical deficiencies during the life of the Charter to date, and materially breached the Charter, causing millions of dollars in damages to CME.

## SMA Arbitration

17.   For the reasons stated above, concurrently with this action, pursuant to the binding arbitration clause in Section 22(B) of the Charter, CME has initiated binding arbitration in New York before a 3-arbitrator panel of the Society of Maritime Arbitrators, Inc. ("SMA") by issuing a Notice to Gretchen/Kyma appointing its arbitrator in accordance with the SMA Rules.

18.   In the arbitration, CME seeks not only to recover millions of dollars of damages and losses caused by the failures of the General Piar, but also to rescind and/or cancel the Charter based upon material breaches by Gretchen/Kyma and

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

complete failure to perform in accordance with the material misrepresentations of Gretchen/Kyma, including but not limited to the discharge rate.

19.   Following the initiation of arbitration, Gretchen/KYMA has 20 days to appoint its arbitrator, then the two arbitrators selected must appoint a third arbitrator to complete the panel.

20.   Therefore, it may be one or two months before an arbitral panel is fully convened.

21.   In the interim, without the injunctive relief requested herein, Gretchen/Kyma can immediately drawdown the letter of credit at any time, without any notice to CME, upon presenting certain documents, whether or not such documents are accurate or fraudulent.

22.   Additionally, it may be over a full year before an arbitral panel reaches an award.

23.   Without the injunctive relief requested herein, CME will suffer irreparable harm, as set forth in greater detail below.

## Jurisdiction and Venue

24.   Citibank, N.A. is subject to personal jurisdiction in this district, both general and specific, as it meets the long-arm statute, and has sufficient contacts with this jurisdiction, including:  Citibank maintains offices herein; purposefully conducts business activities herein; contracted to supply services or things herein; procured or agreed to pay the Letter of Credit herein; regularly conducts business, solicits business, and engages in persistent course of conduct herein; systematically

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

directs business activities herein; derives substantial revenue from goods and/or services used or consumed herein; has interests in real property herein; has contracted to insure person(s), property, or risks herein; purposely availed itself of the privilege of doing business herein; can reasonably expect to be haled into court; among other things.

25.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1332, as well as 12 U.S.C. Section 632, which grants original jurisdiction to federal district courts in civil suits "to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations," which includes transactions such as the Letter of Credit at issue here.

26.   CME is a British Virgin Islands entity with offices in Miami, Florida.

27.   Diversity exists because Citibank, N.A. is a citizen of South Dakota, because Citibank is a national banking association and its articles designate its "Head Office" as Sioux Falls, South Dakota.  *See* 28 U.S.C. § 1348; Citibank, N.A. By-Laws.

28.   The Letter of Credit at issue herein was obtained from Citibank, N.A., and the LOC is serviced by Citicorp. North America, Inc., in Tampa, Florida.

29.   Kyma has its principal office in Miami, Florida.

30.   Through its Miami office, Kyma conducts all actions on behalf of Owners with respect to CME's Charter of the General Piar.

31.   Accordingly, a substantial part of the actions giving rise to this Complaint, including but not limited to the fraudulent misrepresentations and material breaches by Gretchen/Kyma, as well as the negotiation and agreement to enter into the Charter, including the Charter's clause giving rise to the Letter of Credit, occurred in Miami, Florida.

32.   Venue is proper pursuant to 28 U.S.C. 1391.

33.   The amount in controversy clearly exceeds the $75,000 jurisdictional threshold because the Letter of Credit at issue herein is $2.5 million.

### Count I – Emergency Temporary Restraining Order

34.   CME incorporates and re-alleges paragraphs 1 through 28 as if fully set forth herein.

35.   CME seeks this temporary restraining order in good faith to preserve the status quo and permit the 3-person SMA arbitration panel to fully adjudicate the disputes between CME and Gretchen/Kyma.

36.   CME will suffer irreparable harm if Citibank permits Gretchen/Kyma to sidestep the binding arbitration clause in the Charter and drawdown the $2.5 million Letter of Credit.

37.   The need for an immediate temporary restraining order to prevent drawdown on the Letter of Credit is particularly urgent where CME has no recourse through arbitration until the panel convenes, which may not occur for 1-2 months, and reaches a final award, which may not occur for over 1 year.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A.,*
*Case No. _____-cv-_____/_____*

38. In the meantime, CME has no adequate remedy at law, because it cannot pursue substantive relief in court due to the binding arbitration clause, nor can it will it obtain any relief from the arbitration panel until the panel is fully convened and renders an award.

39. In the interim, Gretchen/Kyma could drawdown the $2.5 million Letter of Credit at any time, leaving CME without any remedy and completely unable to recover the funds.

40. Additionally, Gretchen/Kyma can transfer the funds, leaving Gretchen insolvent, and depriving CME of any ability to recover the funds following arbitration.

41. Without a temporary restraining order and injunctive relief, even if CME prevailed on every dispute, including its fraud claims, and successfully rescinded or cancelled the contract, CME would be left with a worthless arbitration award without any means of enforcement.

42. Therefore, irreparable harm will result unless a temporary restraining order is entered.

43. Additionally, an ex parte temporary restraining order is appropriate because immediate, irreparable harm, injury, loss, and damage will be suffered by CME before Citibank can be heard in opposition. *See* Fed. R. Civ. P. 65(b)(1)(A).

44. Because Gretchen/Kyma repeatedly violated the material terms of the Charter, including but not limited to the discharge rate of the Vessel, CME has a substantial likelihood of prevailing on the merits in the arbitration.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

45. While CME will suffer permanent, irreparable injury if a temporary restraining order is not granted, Citibank will not suffer any harm or prejudice of any kind, nor will Gretchen/Kyma suffer any harm or prejudice of any kind, if the status quo is preserved by staying any execution on the Letter of Credit until the arbitration is completed.

46. Granting this temporary restraining order will not cause harm to any others.

47. The public interest is substantially advanced by reinforcing the binding arbitration clause, maintaining the action within the SMA arbitral panel, and avoiding an end-run around the binding arbitration clause in the Charter.

48. Moreover, the public interest is advanced by preventing Gretchen/Kyma from fraudulently inducing CME to enter into a Charter based upon material misrepresentations in the Charter, then secretly drawing from the $2.5 million Letter of Credit when CME invokes its right to arbitrate the disputes arising from the material failures and breakdowns of the Vessel, and leaving CME with a worthless, unenforceable award after over a year of litigation.

49. CME has not provided prior notice to Citibank in order to avoid tipping off Gretchen/Kyma, and thereby prompting Gretchen/Kyma to immediately drawdown the Letter of Credit. Undersigned counsel certifies this statement in accordance with Rule 65(b)(1)(B), and relies upon the statements herein in support thereof.

50. Without the preliminary injunction requested herein, Gretchen/Kyma would gain a windfall of $2.5 million Letter of Credit that it obtained through

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 · Telephone: 305-379-3686 ·Facsimile: 305-379-3690

fraudulently misrepresenting the Vessel it chartered to CME, fraudulently inducing CME to enter the Charter, and materially breaching the Charter's obligations throughout its term.

51.  Additionally, Gretchen/Kyma should not be permitted to reap the benefit of a Letter of Credit pursuant to the Charter, particularly where the fraud, material breaches, unseaworthiness, and dysfunction of the Vessel may result in the cancellation or rescission of the Charter in the arbitration.

WHEREFORE, Plaintiff CME respectfully requests the issuance of an emergency temporary restraining order, without notice pursuant to Federal Rules of Civil Procedure 65(b) and otherwise, enjoining Citibank from paying any portion of the $2.5 million Letter of Credit to Gretchen/Kyma, as well as additional relief as this Court deems proper.

## Count II – Emergency Preliminary Injunction

52.  CME incorporates and re-alleges paragraphs 1 through 28 as if fully set forth herein.

53.  CME seeks this preliminary injunction in good faith to preserve the status quo and permit the 3-person SMA arbitration panel to fully adjudicate the disputes between CME and Gretchen/Kyma.

54.  CME will suffer irreparable harm if Citibank permits Gretchen/Kyma to sidestep the binding arbitration clause in the Charter and drawdown the $2.5 million Letter of Credit.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

55.   The need for an immediate preliminary injunction order to prevent drawdown on the Letter of Credit is particularly urgent where CME has no recourse through arbitration until the panel convenes, which may not occur for 1-2 months, and reaches a final award, which may not occur for over 1 year.

56.   In the meantime, CME has no adequate remedy at law, because it cannot pursue substantive relief in court due to the binding arbitration clause, nor can it will it obtain any relief from the arbitration panel until the panel is fully convened and renders an award.

57.   In the interim, Gretchen/Kyma could drawdown the $2.5 million Letter of Credit at any time, leaving CME without any remedy and completely unable to recover the funds.

58.   Additionally, Gretchen/Kyma could transfer the funds, leaving Gretchen insolvent, and depriving CME of any ability to recover the funds following arbitration.

59.   Without injunctive relief, even if CME prevailed on every dispute, including its fraud claims, and rescinded or cancelled the contract, CME would be left with a worthless arbitration award without any means of enforcement.

60.   Therefore, irreparable harm will result unless a preliminary injunction is entered.

61.   Because Gretchen/Kyma repeatedly violated the material terms of the Charter, including but not limited to the discharge rate of the Vessel, CME has a substantial likelihood of prevailing on the merits in the arbitration.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

62.   While CME will suffer permanent, irreparable injury if a preliminary injunction is not granted, Citibank will not suffer any harm or prejudice of any kind, nor will Gretchen/Kyma suffer any harm or prejudice of any kind, if the status quo is preserved by staying any execution on the Letter of Credit until the arbitration is completed.

63.   Granting this preliminary injunction will not cause harm to any others.

64.   The public interest is substantially advanced by reinforcing the binding arbitration clause, maintaining the action within the SMA arbitral panel, and avoiding an end-run around the binding arbitration clause in the Charter.

65.   Moreover, the public interest is advanced by preventing Gretchen/Kyma from fraudulently inducing CME to enter into a Charter based upon material misrepresentations in the Charter, then secretly drawing from the $2.5 million Letter of Credit without notice when CME invokes its right to arbitrate the disputes arising from the material failures and breakdowns of the Vessel, and leaving CME with a worthless, unenforceable award after over a year of litigation.

66.   In accordance with Federal Rules of Civil Procedure 65, CME respectfully requests the earliest available hearing on this Count, including the fact that Gretchen/Kyma may drawdown upon the Letter of Credit immediately and without notice to CME. *See* Fed. R. Civ. P. 65(a).

67.   CME has not provided prior notice to Citibank in order to avoid tipping off Gretchen/Kyma, and thereby prompting Gretchen/Kyma to immediately drawdown the Letter of Credit.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

68. Without the preliminary injunction requested herein, Gretchen/Kyma would gain a windfall of $2.5 million Letter of Credit that it obtained through fraudulently misrepresenting the Vessel it chartered to CME, fraudulently inducing CME to enter the Charter, and materially breaching the Charter's obligations throughout its term.

69. Additionally, Gretchen/Kyma should not be permitted to reap the benefit of a Letter of Credit pursuant to the Charter, particularly where the fraud, material breaches, unseaworthiness, and dysfunction of the Vessel may result in the cancellation or rescission of the Charter in the arbitration.

WHEREFORE, Plaintiff CME respectfully requests the issuance of an emergency preliminary injunction, pursuant to Federal Rules of Civil Procedure 65(a) and otherwise, enjoining Citibank from paying any portion of the $2.5 million Letter of Credit to Gretchen/Kyma, as well as additional relief as this Court deems proper.

Respectfully submitted,

Jerry D. Hamilton
Florida Bar No. 970700
jhamilton@hamiltonmillerlaw.com
Matthew P. O'Brien
Florida Bar No. 10072
mobrien@hamiltonmillerlaw.com
HAMILTON, MILLER & BIRTHISEL, LLP
*Attorneys for Plaintiff CME*
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131-2332
Telephone:   (305) 379-3686
Facsimile:   (305) 379-3690

*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A.,*
Case No. _____-cv-_____/ _____

## VERIFICATION

Pursuant to 28 U.S.C. 1746(2), I declare and certify under penalty of perjury that the foregoing is true and correct on this __th day of June, 2012.

_____

Tyrone Serrao
President of Commodities & Minerals Enterprise, Ltd.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A.,*
*Case No. _____-cv-_____ / _____*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 25, 2012, I filed two paper copies of the foregoing document with the Clerk of the court in accordance with the Local Rules directing emergency requests to be paper-filed.

Jerry D. Hamilton
Matthew P. O'Brien

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

| 1.  Shipbroker | BIMCO UNIFORM TIME-CHARTER (AS REVISED 2001) CODE NAME: "BALTIME 1939" |
|---|---|
| | PART I |
| | 2. Place and date of Charter<br>MIAMI, FLORIDA 01/25/2010 |
| 3. Owners/Place of business<br>GRETCHEN SHIPPING INC., LIBERIA | 4. Charterers/Place of business<br>COMMODITIES & MINERALS ENTERPRISE, LTD, BVI |
| 5. Vessel's Name<br>CHRISTOFFER OLDENDORF<br>T.B.R. GENERAL PIAR | 6. GT-NT<br>37,959 / 16,736 |
| 7. Class<br>LLOYD'S REGISTER | 8. Indicated brake horse power (bhp)<br>15,400 |
| 9. Total tons d. w. (abt.) on summer freeboard<br>62,594 | 10. Cubic feet grain/bale capacity<br>59,703.6 CBM / 57,899.8 CBM |
| 11. Permanent bunkers (abt.) | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of<br>13.5 KNOTS |
| 13. Present position<br>TRADING | 14. Period of hire (Cl. 1)<br>60 MONTHS FROM DATE OF DELIVERY EXCLUDING DRYDOCKING AND/OR ANNUAL MAINTENANCE PERIODS, AND OFF-HIRE PERIOD |
| 15. Port of delivery (Cl. 1)<br>MILE MARKER 178 RIO ORINOCO | 16. Time of delivery (Cl. 1)<br>BETWEEN 02/10/2010 - 02/14/2010 UNLESS OTHERWISE AGREED |
| 17. (a) Trade limits (Cl. 2)<br>PUERTO ORDAZ, PALUA, MATANZAS, CHINA,  BOCA GRANDE, UNLESS OTHERWISE AGREED | |
| (b) Cargo exclusions specially agreed<br>NO USE OF GRABS | |
| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5)<br>NO MAXIMUM<br>40 TONS MDO,  100 TONS IFO - MIN | 19. Charter hire (Cl. 6)<br>USD 25,641.03 PER DAY, INCREASING BY 2% PER ANNUM, COMMENCING ONE YEAR AFTER DATE OF DELIVERY |
| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)<br>IN U.S.DOLLARS BY SWIFT TRANSFER. HIRE TO BE PAID PUNCTUALLY AND REGULARLY, STRICTLY ON TIME AND WITHOUT ANY DELAY, FREE OF ANY DEDUCTIONS OR BANK CHARGES, INTO OWNERS' BANK ACCOUNT....................................<br>IN FAVOR OF  GRETCHEN SHIPPING INC. THROUGHOUT THE CHARTER PERIOD. | |
| 21. Place or range of re-delivery (Cl. 7)<br>BOCA GRANDE II OR ANY OTHER PORT MUTUALLY AGREED | 22. Cancelling date (Cl. 21)<br>TO BE AGREED |
| 23. Dispute resolution (state 22(A), 22(B) or 22(C), if 22(C) agreed Place of Arbitration must be stated) (Cl. 22)<br>22 (B) | 24. Brokerage commission and to whom payable (Cl. 24)<br>V & H VENTURES. LTD.  2.5% |
| 25. Numbers of additional clauses covering special provisions, if agreed<br>25 - 69 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

*Left margin:* Issued 1909. Amended 1911, 1912, 1920, 1939, 1950, 1974, and 2001

*Left margin:* Printed by BIMCO's idea

*Left margin:* Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen



EXHIBIT

A

tabbies

*(continued)*     **"BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER**     PART I

Signature (Owners)

Secretary   1-25-10
, Gretchen Shipping Inc.

Signature (Charterers)

1-25-10

This document is a computer generated VOLCOA form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed between the party mentioned in Box 3 as Owners 1
of the Vessel named in Box 5 of the gross/net tonnage 2
indicated in Box 6, classed as stated in Box 7 and of indicated 3
brake horse power (bhp) as stated in Box 8, carrying about 4
the number of tons deadweight indicated in Box 9 on 5
summer freeboard inclusive of bunkers, stores and 6
provisions, having as per builder's plan a cubic-feet grain/ 7
bale capacity as stated in Box 10, exclusive of permanent 8
bunkers, which contain about the number of tons stated in 9
Box 11, and fully loaded capable of steaming about the 10
number of knots indicated in Box 12 in good weather and 11
smooth water on a consumption of about the number of 12
tons fuel oil stated in Box 12, now in position as stated in 13
Box 13 and the party mentioned as Charterers in Box 4, as 14
follows: 15

**1. Period/Port of Delivery/Time of Delivery**
The Owners let, and the Charterers hire the Vessel for a 16
period of the number of calendar months indicated in 17
Box 14 from the time of her arrival at M 178 station at the port 18
of vessel's delivery any time of day or night Sundays, 19
Saturdays and Holidays included (not a Sunday or a legal
Holiday
unless taken over) the Vessel is delivered and placed at 20
the disposal of the Charterers between 9 a.m. and 6 21
p.m., or between 9 a.m. and 2 p.m. if on Saturday, at the 22
port stated in Box 15 in such available berth where she 23
can safely lie always afloat, as the Charterers may direct, 24
the Vessel being in every way fitted for ordinary cargo 25
service. The Vessel shall be delivered at the time 26
indicated in Box 16. 27

**2. Trade**
The Vessel shall be employed in lawful trades for the 28
carriage of lawful dry bulk cargo merchandise only between 29
safe ports 30
or places where the Vessel can safely lie always afloat 31
within the limits stated in Box 17. No live stock nor 32
injurious, inflammable or dangerous goods (such as 33
acids, explosives, calcium carbide, ferro silicon, 34
naphtha, motor spirit, tar, or any of their products) shall 35
be shipped. 36

**3. Owners' Obligations**
The Owners shall provide and pay for all provisions and 37
Wages, for ordinary H+M and P+I insurance of the Vessel, 38
for all deck and 39
Engine-room stores and maintain her in a thoroughly 40
efficient state in hull and machinery during service. The 41
Owners shall provide winchman or other qualified crewmen
for loading/discharging operations of the ship and suitable
ship's fenders for ship to ship transfers. The vessel shall be
fitted with special self-unloading machinery for discharging
bulk cargo.
Owners shall provide winchmen from the crew to 42
operate the Vessel's cargo handling gear, unless the 43
crew's employment conditions or local union or port 44
regulations prohibit this, in which case qualified shore- 45
winchmen shall be provided and paid for by the 46
Charterers. 47

**4. Charterers' Obligations**
The Charterers shall provide and pay for all fuel oil, port 48
charges, pilotages (whether compulsory or not), canal 49
steersmen, boatage, lights, tug-assistance, consular 50
charges (except those pertaining to the Master, officers 51
and crew), canal, dock and other dues and charges, 52
including any foreign general municipality or state taxes, 53
also all dock, harbour and tonnage dues at the ports of 54
delivery and re-delivery (unless incurred through cargo 55
carried before delivery or after re-delivery), agencies, 56
commissions, also shall arrange and pay for loading, 57
trimming, stowing (including dunnage and shifting 58
boards, excepting any already on board), unloading, 59
weighing, tallying and delivery of cargoes, surveys on 60
hatches, meals supplied to officials and men in their 61
service and all other charges and expenses whatsoever 62
including detention and expenses through quarantine 63
(including cost of fumigation and disinfection). All ropes, 64
slings and special runners actually used for loading 65
and discharging and any special gear, including special 66
ropes and chains required by the custom of the port for 67
mooring shall be for the Charterers' account. The Vessel 68
shall be fitted with winches, derricks, wheels and or- 69
dinary runners capable of handling lifts up to 2 tons. 70
71

**5. Bunkers**
The Charterers at port of delivery and the Owners at port 72
of re-delivery shall take over and pay for all fuel oil 73
remaining in the Vessel's bunkers as per last invoice per ton 74
with accompanied proof of payment, at current price at the 75
respective ports. The Vessel shall be re-delivered with 76
not less than the number of tons and not exceeding the 77
number of tons of fuel oil in the Vessel's bunkers stated 78
in Box 18. 79

**6. Hire**
The Charterers shall pay as hire the rate stated in Box 80
19 per 15 30 days, commencing in accordance with Clause 81
1 until her re-delivery to the Owners. 82
Payment of hire shall be made in cash, in the currency 83
stated in Box 20, without discount, every 15 30 days, in 84
advance, and in the manner prescribed in Box 20. In 85
default of payment the Owners shall have the right of 86
withdrawing the Vessel from the service of the Charterers, 87
without noting any protest and without interference by 88
any court or any other formality whatsoever and without 89
prejudice to any claim the Owners may otherwise have 90
on the Charterers under the Charter. 91

**7. Re-delivery**
The Vessel shall be re-delivered on the expiration of the 92
Charter in the same good order as when delivered to 93
the Charterers (fair wear and tear excepted) at an ice- 94
free port in the Charterers' option at the place or within 95
the range stated in Box 21, at any time day or night 96
Saturdays, Sundays and Holidays included between 9 a.m. 97
and 6 p.m., 98
and 9 a.m. and 2 p.m. on Saturday, but the day of re- 99
delivery shall not be a Sunday or legal Holiday.
The Charterers shall give the Owners not less than thirty 100
(30) ten 101
days' notice at which port and on about which day the 102
Vessel will be re-delivered. Should the Vessel be ordered 103
on a voyage by which the Charter period will be exceeded 104
the Charterers shall have the use of the Vessel to enable 105
them to complete the voyage, provided it could be 106
reasonably calculated that the voyage would allow 107
redelivery about the time fixed for the termination of the 108
Charter, but for any time exceeding the termination date 109
the Charterers shall pay the market rate if higher than 110
the rate stipulated herein. 111

**8. Cargo Space**
The whole reach and burthen of the Vessel, including 112
lawful deck-capacity shall be at the Charterers' disposal, 113
reserving proper and sufficient space for the Vessel's 114
Master, officers, crew, tackle, apparel, furniture, 115
provisions and stores. 116
117

**9. Master**
The Master shall prosecute all voyages with the utmost 118
despatch and shall render customary assistance with 119
the Vessel's crew. The Master shall be under the orders 120
121

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**PART II**
**"BALTIME 1939" Uniform Time-Charter (as revised 2001)**

| | |
|---|---|
| of the Charterers as regards employment, agency, or | 122 |
| other arrangements. The Charterers shall indemnify the | 123 |
| Owners against all consequences or liabilities arising | 124 |
| from the Master, officers or Agents signing Bills of Lading | 125 |
| or other documents or otherwise complying with such | 126 |
| orders, as well as from any irregularity in the Vessel's | 127 |
| papers or for overcarrying goods. The Owners shall not | 128 |
| be responsible for shortage, mixture, marks, nor for | 129 |
| Number of pieces or packages, nor for damage to or | 130 |
| claims on cargo caused by bad stowage or otherwise. If | 131 |
| the Charterers have reason to be dissatisfied with the | 132 |
| conduct of the Master or any officer, the Owners, on | 133 |
| receiving particulars of the complaint, promptly to | 134 |
| investigate the matter, and, if necessary and practicable, | 135 |
| to make a change in the appointments. | 136 |

**10. Directions and Logs**

| | |
|---|---|
| The Charterers shall furnish the Master with all | 137 |
| instructions and sailing directions and the Master shall | 138 |
| keep full and correct logs accessible to the Charterers | 139 |
| or their Agents. | 140 |

**11. Suspension of Hire etc.**

| | |
|---|---|
| (A) In the event of drydocking or other necessary | 141 |
| measures to maintain the efficiency of the Vessel, | 142 |
| deficiency of men or Owners' stores, breakdown of | 143 |
| machinery, damage to hull or other accident, either | 144 |
| hindering or preventing the working of the Vessel and | 145 |
| continuing for more than twenty-four consecutive hours, | 146 |
| no hire shall be paid in respect of any time lost thereby | 147 |
| during the period in which the Vessel is unable to perform | 148 |
| the service immediately required. Any hire paid in | 149 |
| advance shall be adjusted accordingly. | 150 |
| (B) In the event of the Vessel being driven into port or to | 151 |
| anchorage through stress of weather, trading to shallow | 152 |
| harbours or to rivers or ports with bars or suffering an | 153 |
| accident for her cargo, any detention of the Vessel and/or | 154 |
| expenses resulting from such detention shall be for the | 155 |
| Charterers' account, even if such detention and/or | 156 |
| expenses, or the cause by reason of which either is | 157 |
| incurred, be due to, or be contributed to by, the | 158 |
| negligence of the Owners' servants. | 159 |

**12. Responsibility and Exemption**

| | |
|---|---|
| The Owners only shall be responsible for delay in | 160 |
| delivery of the Vessel or for delay during the currency of | 161 |
| the Charter and for loss or damage to goods onboard, if | 162 |
| such delay or loss has been caused by want of due | 163 |
| diligence on the part of the Owners or their Manager in | 164 |
| making the Vessel seaworthy and fitted for the voyage | 165 |
| or any other personal act or omission or default of the | 166 |
| Owners or their Manager. The Owners shall not be | 167 |
| responsible in any other case nor for damage or delay | 168 |
| whatsoever and howsoever caused even if caused by | 169 |
| the neglect or default of their servants. The Owners shall | 170 |
| not be liable for loss or damage arising or resulting | 171 |
| from strikes, lock-outs or stoppage or restraint of labour | 172 |
| (including the Master, officers or crew) whether partial | 173 |
| or general. The Charterers shall be responsible for loss | 174 |
| or damage caused to the Vessel or to the Owners by | 175 |
| goods being loaded contrary to the terms of the Charter | 176 |
| or by improper or careless bunkering or loading, stowing | 177 |
| or discharging of goods or any other improper or | 178 |
| negligent act on their part or that of charterer's, their | 179 |
| servants. | 180 |

**13. Advances**

| | |
|---|---|
| The Charterers or their Agents shall advance to the | 181 |
| Master, if required, necessary funds for ordinary | 182 |
| disbursements for the Vessel's account at any port | 183 |
| charging only interest at 6-3 (three) per cent. p.a., such | 184 |
| advances | 185 |
| | 186 |
| | 187 |

| | |
|---|---|
| shall be deducted from hire. | 188 |

**14. Excluded Ports**

| | |
|---|---|
| The Vessel shall not be ordered to nor bound to enter: | 189 |
| (A) any place where fever or epidemics are prevalent or | 190 |
| to which the Master, officers and crew by law are not | 191 |
| bound to follow the Vessel; | 192 |
| (B) any ice-bound place or any place where lights, | 193 |
| lightships, marks and buoys are or are likely to be | 194 |
| withdrawn by reason of ice on the Vessel's arrival or | 195 |
| where there is risk that ordinarily the Vessel will not be | 196 |
| able on account of ice to reach the place or to get out | 197 |
| after having completed loading or discharging. The | 198 |
| Vessel shall not be obliged to force ice. If on account of | 199 |
| ice the Master considers it dangerous to remain at the | 200 |
| loading or discharging place for fear of the Vessel being | 201 |
| frozen in and/or damaged, he has liberty to sail to a | 202 |
| convenient open place and await the Charterers' fresh | 203 |
| instructions. Unforeseen detention through any of above | 204 |
| causes shall be for the Charterers' account. | 205 |

**15. Loss of Vessel**

| | |
|---|---|
| Should the Vessel be lost or missing, hire shall cease | 206 |
| from the date when she was lost. If the date of loss | 207 |
| cannot be ascertained half hire shall be paid from the | 208 |
| date the Vessel was last reported until the calculated | 209 |
| date of arrival at the destination. Any hire paid in advance | 210 |
| shall be adjusted accordingly. | 211 |

**16. Overtime**

| | |
|---|---|
| The Vessel shall work day and night if required. | 212 |
| Charter hire includes officers and crew overtime. | 213 |
| The | 214 |
| Charterers shall refund the Owners their outlays for all | 215 |
| overtime paid to officers and crew according to the hours | 216 |
| and rates stated in the Vessel's articles. | 217 |

**17. Lien**

| | |
|---|---|
| The Owners shall have a lien upon all cargoes and | 218 |
| sub-freights belonging to the Time-Charterers and any | 219 |
| Bill of Lading freight for all claims under this Charter, | 220 |
| and the Charterers shall have a lien on the Vessel for all | 221 |
| moneys paid in advance and not earned. | 222 |

**18. Salvage**

| | |
|---|---|
| All salvage and assistance to other vessels shall be for | 223 |
| the Owners' and the Charterers' equal benefit after | 224 |
| deducting the Master's, officers' and crew's proportion | 225 |
| and all legal and other expenses including hire paid | 226 |
| under the charter for time lost in the salvage, also repairs | 227 |
| of damage and fuel oil consumed. The Charterers shall | 228 |
| be bound by all measures taken by the Owners in order | 229 |
| to secure payment of salvage and to fix its amount. | 230 |

**19. Sublet**

| | |
|---|---|
| The Charterers shall have the option of subletting the | 231 |
| Vessel, subject to Owners' approval, not to be unreasonably | 232 |
| withheld, giving due notice to the Owners, but the original | 233 |
| Charterers shall always remain responsible to the | 234 |
| Owners for due performance of the Charter. | 235 |

**20. War ("Conwartime 1993")**

| | |
|---|---|
| (A)  For the purpose of this Clause, the words: | 236 |
| (I)  "Owners" shall include the shipowners, bareboat | 237 |
| charterers, disponent owners, managers or other | 238 |
| operators who are charged with the management of the | 239 |
| Vessel, and the Master; and | 240 |
| (II)  "War Risks" shall include any war (whether actual or | 241 |
| threatened), act of war, civil war, hostilities, revolution, | 242 |
| rebellion, civil commotion, warlike operations, the laying | 243 |
| of mines (whether actual or reported), acts of piracy, | 244 |
| acts of terrorists, acts of hostility or malicious damage, | 245 |
| blockades (whether imposed against all vessels or | 246 |

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of the document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BALTIME 1939" Uniform Time-Charter (as revised 2001)**

imposed selectively against vessels of certain flags or 251
ownership, or against certain cargoes or crews or 252
otherwise howsoever), by any person, body, terrorist or 253
political group, or the Government of any state 254
whatsoever, which, in the reasonable judgement of the 255
Master and/or the Owners, may be dangerous or are 256
likely to be or to become dangerous to the Vessel, her 257
cargo, crew or other persons on board the Vessel. 258
(B)  The Vessel, unless the written consent of the Owners 259
be first obtained, shall not be ordered to or required to 260
continue to or through, any port, place, area or zone 261
(whether of land or sea), or any waterway or canal, where 262
it appears that the Vessel, her cargo, crew or other 263
persons on board the Vessel, in the reasonable 264
judgement of the Master and/or the Owners, may be, or 265
are likely to be, exposed to War Risks. Should the Vessel 266
be within any such place as aforesaid, which only 267
becomes dangerous, or is likely to be or to become 268
dangerous, after her entry into it, she shall be at liberty 269
to leave it. 270
(C)  The Vessel shall not be required to load contraband 271
cargo, or to pass through any blockade, whether such 272
blockade be imposed on all vessels, or is imposed 273
selectively in any way whatsoever against vessels of 274
certain flags or ownership, or against certain cargoes 275
or crews or otherwise howsoever, or to proceed to an 276
area where she shall be subject, or is likely to be subject 277
to a belligerent's right of search and/or confiscation. 278
(D)  (i)  The Owners may effect war risks insurance in 279
respect of the Hull and Machinery of the Vessel and their 280
other interests (including, but not limited to, loss of 281
earnings and detention, the crew and their Protection 282
and Indemnity Risks), and the premiums and/or calls 283
therefor shall be for their account. 284
(ii)  If the Underwriters of such insurance should require 285
payment of premiums and/or calls because, pursuant 286
to the Charterers' orders, the Vessel is within, or is due 287
to enter and remain within, any area or areas which are 288
specified by such Underwriters as being subject to 289
additional premiums because of War Risks, then such 290
premiums and/or calls shall be reimbursed by the 291
Charterers to the Owners at the same time as the next 292
payment of hire is due. 293
Charterers acknowledge that Venezuela is an additional
premium area. So any extra insurance premium of any
nature whatsoever to be paid for by the Charterers upon
their being presented with Owners' insurers official
vouchers.
(E)  If the Owners become liable under the terms of 294
employment to pay to the crew any bonus or additional 295
wages in respect of sailing into an area which is 296
dangerous in the manner defined by the said terms, 297
then such bonus or additional wages shall be re- 298
imbursed to the Owners by the Charterers at the same 299
time as the next payment of hire is due. 300
(F)  The Vessel shall have liberty:- 301
(i)  to comply with all orders, directions, recom- 302
mendations or advice as to departure, arrival, routes, 303
sailing in convoy, ports of call, stoppages, destinations, 304
discharge of cargo, delivery, or in any other way 305
whatsoever, which are given by the Government of the 306
Nation under whose flag the Vessel sails, or other 307
Government to whose laws the Owners are subject, or 308
any other Government, body or group whatsoever acting 309
with the power to compel compliance with their orders 310
or directions; 311
(ii)  to comply with the order, directions or recom- 312
mendations of any war risks underwriters who have the 313
authority to give the same under the terms of the war 314
risks insurance; 315

(iii)  to comply with the terms of any resolution of the 316
Security Council of the United Nations, any directives of 317
the European Community, the effective orders of any 318
other Supranational body which has the right to issue 319
and give the same, and with national laws aimed at 320
enforcing the same to which the Owners are subject, 321
and to obey the orders and directions of those who are 322
charged with their enforcement; 323
(iv)  to divert and discharge at any other port any cargo or 324
part thereof which may render the Vessel liable to 325
confiscation as a contraband carrier; 326
(v)  to divert and call at any other port to change the crew 327
or any part thereof or other persons on board the Vessel 328
when there is reason to believe that they may be subject 329
to internment, imprisonment or other sanctions. 330
(G)  If in accordance with their rights under the foregoing 331
provisions of this Clause, the Owners shall refuse to 332
proceed to the loading or discharging ports, or any one 333
or more of them, they shall immediately inform the 334
Charterers. No cargo shall be discharged at any 335
alternative port without first giving the Charterers notice 336
of the Owners' intention to do so and requesting them 337
to nominate a safe port for such discharge. Failing such 338
nomination by the Charterers within 48 hours of the 339
receipt of such notice and request, the Owners may 340
discharge the cargo at any safe port of their own choice. 341
(H)  If in compliance with any of the provisions of sub- 342
clauses (B) to (G) of this Clause anything is done or not 343
done, such shall not be deemed a deviation, but shall 344
be considered as due fulfilment of this Charter. 345

**21.  Cancelling** 346
Should the Vessel not be delivered by the date indicated 347
in Box 22, the Charterers shall have the option of 348
cancelling. If the Vessel cannot be delivered by the 349
cancelling date, the Charterers, if required, shall declare 350
within 48 hours after receiving notice thereof whether 351
they cancel or will take delivery of the Vessel. 352

**22.  Dispute Resolution** 353
½)  (A) This Charter shall be governed by and construed in 354
accordance with English law and any dispute arising 355
out of or in connection with this Charter shall be referred 356
to arbitration in London in accordance with the Arbitration 357
Act 1996 or any statutory modification or re-enactment 358
thereof save to the extent necessary to give effect to the 359
provisions of this Clause. 360
The arbitration shall be conducted in accordance with 361
the London Maritime Arbitrators Association (LMAA) 362
Terms current at the time when the arbitration 363
proceedings are commenced. 364
The reference shall be to three arbitrators.  A party 365
wishing to refer a dispute to arbitration shall appoint its 366
arbitrator and send notice of such appointment in writing 367
to the other party requiring the other party to appoint its 368
own arbitrator within 14 calendar days of that notice and 369
stating that it will appoint its arbitrator as sole arbitrator 370
unless the other party appoints its own arbitrator and 371
gives notice that it has done so within the 14 days 372
specified.  If the other party does not appoint its own 373
arbitrator and give notice that it has done so within the 374
14 days specified, the party referring a dispute to 375
arbitration may, without the requirement of any further 376
prior notice to the other party, appoint its arbitrator as 377
sole arbitrator and shall advise the other party 378
accordingly.  The award of a sole arbitrator shall be 379
binding on both parties as if he had been appointed by 380
agreement. 381
Nothing herein shall prevent the parties agreeing in 382
writing to vary these provisions to provide for the 383

The document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and the computer generated document.

**PART II**
**"BALTIME 1939" Uniform Time-Charter (as revised 2001)**

| | |
|---|---|
| appointment of a sole arbitrator. | 384 |
| In cases where neither the claim nor any counterclaim | 385 |
| exceeds the sum of US$50,000 (or such other sum as | 386 |
| the parties may agree) the arbitration shall be conducted | 387 |
| in accordance with the LMAA Small Claims Procedure | 388 |
| current at the time when the arbitration proceedings are | 389 |
| commenced. | 390 |
| *) (B) This Charter shall be governed by and construed in | 391 |
| accordance with Title 9 of the United States Code and | 392 |
| the Maritime Law of the United States and any dispute | 393 |
| arising out of or in connection with this Contract shall | 394 |
| be referred to three persons at New York, one to be | 395 |
| appointed by each of the parties hereto, and the third by | 396 |
| the two so chosen; their decision or that of any two of | 397 |
| them shall be final, and for the purposes of enforcing | 398 |
| any award, judgement may be entered on an award by | 399 |
| any court of competent jurisdiction. The proceedings | 400 |
| shall be conducted in accordance with the rules of the | 401 |
| Society of Maritime Arbitrators, Inc. | 402 |
| In cases where neither the claim nor any counterclaim | 403 |
| exceeds the sum of US$50,000 (or such other sum as | 404 |
| the parties may agree) the arbitration shall be conducted | 405 |
| in accordance with the Shortened Arbitration Procedure | 406 |
| of the Society of Maritime Arbitrators, Inc. current at the | 407 |
| time when the arbitration proceedings are commenced. | 408 |
| *) (C) This Charter shall be governed by and construed in | 409 |
| accordance with the laws of the place mutually agreed | 410 |
| by the parties and any dispute arising out of or in | 411 |
| connection with this Charter shall be referred to | 412 |
| arbitration at a mutually agreed place, subject to the | 413 |
| procedures applicable there. | 414 |
| (D) Notwithstanding (A), (B) or (C) above, the parties | 415 |
| may agree at any time to refer to mediation any difference | 416 |
| and/or dispute arising out of or in connection with this | 417 |
| Charter. | 418 |
| In the case of a dispute in respect of which arbitration | 419 |
| has been commenced under (A), (B) or (C) above, the | 420 |
| following shall apply:- | 421 |
| (i) Either party may at any time and from time to time | 422 |
| elect to refer the dispute or part of the dispute to | 423 |
| mediation by service on the other party of a written notice | 424 |
| (the "Mediation Notice") calling on the other party to agree | 425 |
| to mediation. | 426 |
| (ii) The other party shall thereupon within 14 calendar | 427 |
| days of receipt of the Mediation Notice confirm that they | 428 |
| agree to mediation, in which case the parties shall | 429 |
| thereafter agree a mediator within a further 14 calendar | 430 |
| days, failing which on the application of either party a | 431 |
| mediator will be appointed promptly by the Arbitration | 432 |
| Tribunal ("the Tribunal") or such person as the Tribunal | 433 |
| may designate for that purpose.  The mediation shall | 434 |

| | |
|---|---|
| be conducted in such place and in accordance with such | 435 |
| procedure and on such terms as the parties may agree | 436 |
| or, in the event of disagreement, as may be set by the | 437 |
| mediator. | 438 |
| (iii) If the other party does not agree to mediate, that fact | 439 |
| may be brought to the attention of the Tribunal and may | 440 |
| be taken into account by the Tribunal when allocating | 441 |
| the costs of the arbitration as between the parties. | 442 |
| (iv) The mediation shall not affect the right of either party | 443 |
| to seek such relief or take such steps as it considers | 444 |
| necessary to protect its interest. | 445 |
| (v) Either party may advise the Tribunal that they have | 446 |
| agreed to mediation. The arbitration procedure shall | 447 |
| continue during the conduct of the mediation but the | 448 |
| Tribunal may take the mediation timetable into account | 449 |
| when setting the timetable for steps in the arbitration. | 450 |
| (vi) Unless otherwise agreed or specified in the | 451 |
| mediation terms, each party shall bear its own costs | 452 |
| incurred in the mediation and the parties shall share | 453 |
| equally the mediator's costs and expenses. | 454 |
| (vii) The mediation process shall be without prejudice | 455 |
| and confidential and no information or documents | 456 |
| disclosed during it shall be revealed to the Tribunal | 457 |
| except to the extent that they are disclosable under the | 458 |
| law and procedure governing the arbitration. | 459 |
| (Note: The parties should be aware that the mediation | 460 |
| process may not necessarily interrupt time limits.) | 461 |
| (E) If Box 23 in Part I is not appropriately filled in, sub- | 462 |
| clause (A) of this Clause shall apply. Sub-clause (D) | 463 |
| shall apply in all cases. | 464 |
| *  (A), (B) and (C) are alternatives; indicate alternative | 465 |
| agreed in Box 23. | 466 |

**23. General Average**

| | |
|---|---|
| General Average shall be settled according to York/ | 467 |
| Antwerp Rules, 1994 and any subsequent modification | 468 |
| thereof. Hire shall not contribute to General Average. | 469 |
| | 470 |

**24. Commission**

| | |
|---|---|
| The Owners shall pay a commission at the rate stated | 471 |
| in Box 24 to the party mentioned in Box 24 on any hire | 472 |
| paid under the Charter, but in no case less than is | 473 |
| necessary to cover the actual expenses of the Brokers | 474 |
| and a reasonable fee for their work. If the full hire is not | 475 |
| paid owing to breach of Charter by either of the parties | 476 |
| the party liable therefor shall indemnify the Brokers | 477 |
| against their loss of commission. Should the parties | 478 |
| agree to cancel the Charter, the Owners shall indemnify | 479 |
| the Brokers against any loss of commission but in such | 480 |
| case the commission not to exceed the brokerage | 481 |
| on one year's hire. | 482 |
| | 483 |

ADDITIONAL CLAUSES NO. 25 THROUGH TO NO. 69, BOTH
INCLUSIVE, FORM PART OF THIS C/P AND FULLY APPLY

FOR THE OWNERS                    FOR THE CHARTERERS

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document

ADDITIONAL CLAUSES TO THE C/P DATED JANUARY 25, 2010

M/V CHRISTOFFER_OLDENDORFF t.b.r. GENERAL PIAR

25. Security
Charterers shall cause a first class bank acceptable to Owners to issue an Irrevocable Standby Letter of Credit,("Standby L/C"), in the amount of USD 2,500,000.00 in favor of Owners.
The Standby L/C shall be issued concurrently with the date of this Charter in accordance with the following terms of drawdown:
- Issuing Bank: First class bank with offices in Miami that is acceptable to Owners
- Validity of Letter of Credit: 5 years plus 60 days from the date of issuance
- Aggregate amount of Irrevocable Standby L/C: US$2,500,000
- Purpose: To secure payment obligations of the Charterers to Owners
- Partial Draws permitted
- Documents required for drawdown either:
  - Non-payment of Charter Hire- Beneficiary's draft (s) at sight drawn on (name of issuing bank) accompanied by a statement signed by someone purporting to be an Officer of the Beneficiary, certifying that the Applicant, Commodities & Minerals Enterprise Ltd., has not paid Charter Hire due on (due date of payment) under the Charter Agreement between Gretchen Shipping Inc. and Commodities Minerals Enterprise Ltd.; or
  - Beneficiary's draft at sight drawn on (name of issuing bank) accompanied by a copy of an arbitration award against the Applicant and in favor of the Beneficiary
- Limitations to amounts drawn for non-payment of Charter Hire: Beneficiary shall not be able to draw down more than US$769,230.90 in the first year of the Charter, increasing by 2% in each succeeding year, for reasons of non-payment of Charter Hire for a period of 30 days after the initial draw down for non-payment of Charter Hire. If the Applicant has not effected an amendment to the Standby L/C or caused a new Standby L/C to be issued in favor of the Beneficiary within the 30-day period so as to once again provide the Beneficiary with a total of US$2,500,000 in its favor in the form of an Irrevocable Standby Letter of Credit(s), then the Beneficiary can draw down the full amount remaining under the Letter of Credit.
- If the Beneficiary received notice from the issuing bank that the Letter of Credit will not be renewed or is being cancelled, then the Beneficiary shall be able to draw down the full amount of the Letter of Credit

26. On arrival at first loading port the Vessel's holds are to be clean, dry and free from dust and in all respects ready to load a full cargo.

27. The Charterers to have the option of redelivering the Vessel unclean and Charterers to pay us$ 2500 lumpsum with last hire



28. Owners to give the Charterers 15/10/5/3/2 days approximate notice and 24 hrs definite Notice of delivery. For redelivery Charterers are to give Owners 25 days notice of redelivery with intended port followed by 15/10/5/3 days approximately Notice of redelivery and 48/24 hrs definite Notice of redelivery with final port.

29. Owners and Charterers to share equal 50/50, time and expense for delivery/on-hire and redelivery/off-hire survey. Reports shall be prepared and signed by an independent surveyor appointed jointly by Owners and Charterers. Survey fees to be shared equally.

30. Any damage caused by stevedores during the period of this Charter shall be reported by the Master to the Charterers or their Agents in writing within 24 hours of the occurrence or as soon as possible thereafter, but latest when the damage could have been discovered by the exercise of due diligence. The Master shall do his best to obtain written acknowledgment by the responsible parties that caused the damage, unless the damage has been made good in the meantime.

Stevedoring damage affecting seaworthiness or the proper work of the Vessel and/or her equipment shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and at their expense.

All damages which are to be repaired by Charterers and which are not fair wear and tear and do not affect the Vessel's seaworthiness, are to remain for subsequent repair when Vessel is to dock for Owners' account so that Charterers pay the actual cost of such repairs, but not for the time used, except when such time is beyond what Owners require to complete their works.

31. The Charterers shall leave the Vessel in seaworthy condition and with cargo on board, safely stowed to the Master's satisfaction between loading berth/ports and discharging berth/ports. Any expenses resulting therefrom shall be for Charterers' account and any time used shall count as on-hire time.

32. The Charterers have the privilege of loading cargo on deck and on hatches at their risk and expense in accordance with good sea practices and with the permissible cargo loading as per the shipbuilder's, stability and visibility and to master's satisfaction. Any deck cargo is always subject to the Master's approval in respect of the Vessel's seaworthiness. All Bills of lading concerning deck cargo to display a clause, stating that it is being carried on deck at shippers' or Charterers' risk (as the case may be) and responsibility. Insurance for Deck Cargo to be for Charterers' account

33. Watchmen for the Vessel, if required by the Master, to be for the Owners' account, unless it is compulsory to take watchmen from the shore in which case the same are to be for the Charterers' account and same to be agreed/arranged directly with the Master.

34. Cargo to be always loaded, stowed, carried and discharged in compliance with relevant local regulations and IMO requirements.

35. The Vessel shall be capable, at all times during the currency of this Charter, of steaming as per directions in good weather conditions for the purpose of this Charter. Good weather conditions are to be defined as weather conditions in winds speeds not exceeding Beaufort force 4 (four) and sea Douglas State 3(three), and with good visibility.

36. All cargo to be loaded/carried and discharged under the Master's supervision and in accordance with the requirements of the Vessel's strength and stability specifications.

37. Should the Vessel be on her voyage towards the port of redelivery at the time when payment of hire is due, Owners and Charterers or their agents shall consider the estimated time necessary to complete the voyage when calculating the payment due.

When the Vessel is redelivered any difference shall be refunded by the Owners or paid by the Charterers, as may be required, less any Owners' expenses and actual bunkers remaining on re-delivery.

38. Intentionally left blank.

39. The Vessel to work night and day/or weekend/holidays, if requested by Charterers, and duly rigged by crew at all time as requested by the Charterers. All gear to be at the Charterers' disposal during loading and discharging the Vessel to allow the crew to work day and night, also to open and close hatches, to remove and replace beams and hatch boards or pontoons, where so fitted, as required by the Charterers.

All opening/closing of hatches to be done by crew, whenever required by Charterers. If the rules of the port or labor unions prevent the crew from opening or closing hatches, removing and replacing beams and hatch boards or pontoons, where so fitted, shore labor to be paid by the Charterers. In the event of disabled gear or insufficient power to operate gear, the Owners to pay for suitable substitute shore engine(s) and also for any stevedores standby time occasioned thereby but limited to one shift. Hire to be reduced proportionally to the total number of working hatches, for all time the gear is unavailable due to disability or loss of power.

40. Intentionally left blank.

41. Owners shall provide Charterers with seven days notice to request fuel supply from the Charterers. The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the Vessel's fuel specification(s).

The Owners reserve the right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed, performance and/or increased bunker consumption, nor for any time lost and/or other consequences.

Master/Chief Engineer to satisfy themselves prior to the commencement of bunkering with the quality to be supplied and to always retain 1 (one) sample on board for verification. Any quality claims of substandard fuel to be notified to bunker supplier and Charterers within 72hrs after receiving the laboratory results of bunkering otherwise any claim to be void.

All bunkers to be delivered with clear acknowledgement of the bunkering company that the bunkers are ordered and are for the account of Charterers. Master will log all bunkers receipts accordingly.

Charterers to present Owners with evidence (swift advices) of payments for all bunkers.


42. Intentionally left blank

43. The Charterers may deduct from the monthly hire any amount disbursed for Owners' account and supported by vouchers or necessary proof. The Charterers may deduct from the last payment of hire the value of bunkers estimated to be on board at redelivery and estimated expenses incurred by the Charterers for the Owners' account, for which, however, vouchers have not yet reached the Charterers for submission to the Owners provided such expenses were paid on behalf of the Owners with the Owners' prior approval.


44. Intentionally left blank


45. The Owners warrant that the Vessel shall always be safe in ballast without solid ballast being required. The Vessel shall comply with any local, national or international regulations regarding water pollution. The Vessel also to possess and carry on board a certificate of financial responsibility (oil pollution).


46. The Master, if requested to do so by Charterers, their agents or supercargo, is to sign Charterers' Bill of Lading for cargo as presented in conformity with Mate's receipts without prejudice to this Charter . Master and Owners can authorize Charterers or their agents to sign Bill(s) of Lading on Charterers' behalf in conformity with Mate's receipts. Owners/Master to allow discharge of the

cargo without presentation of Bill(s) of Lading against a Letter of Indemnity as per Owners' P+I club standard wording which to be signed by Charterers. Charterers assuming full liability for such discharge.

The cargo will be discharged in the custody of the Charterers' agents, the port authorities or customs officials, as the custom of the port may be and it is they who will effect actual delivery of the cargo. Should any cargo Receiver/Bill of Lading holder sue the Owners for non-delivery to them of any cargo for reason of the cargo having been delivered to a party not entitled thereto, Charterers will defend such proceeding and indemnify Owners against all losses and consequences.

For change of destination same procedure to be followed with Letter of Indemnity as per Owners' P+I club wording, signed by Charterers.


47. All references to time are understood to be in GMT.


48. The Charterers to have full use of Vessel radio/TLX/FAX/ Mail communication. Owners will arrange direct e-mail transfer between Vessel and Charterers. Charterers to pay for such usage per 30 days (month) pro rata and to be paid with Vessel's hire.


49. Trading always within I.W.L., always afloat via safe ports, safe berths, safe anchorages excluding St Laurence, Cuba (except with US Licensed cargoes or if US ban has been lifted against Cuba. Charterers warrant that if trading to Cuba under these conditions, Vessel will not be black listed in the US and Vessel redelivered free of USA ban), Israel, Iraq, Libya, Lebanon. Cabinda, Amazon River (but Belem and
Vila do Conde allowed), Orinoco River trade permitted however deep sea pilot to be for Charterers' account, Eritrea,Somalia, Gulf of Aden, Nigeria, Sierra Leone, Pakistan, Magellan Strait, Cape Horn Transiting, Hudson Bay, Turkish occupied Cyprus, Syria, Somalia, North Korea, Pacific coast of Russia, any war risk area and any warlike zones in any country where the U.N. decides to boycott or ban the trade, no direct  trading between China and Taiwan and between Turkey and Cyprus, Mindanao, between the ports of Polloc Harbour and Mati incl.

Charterers shall have the option to breach IWL 1/7/76 and Extra War Risks Listed Areas of Joint War Committee Hull, War, Strikes, Terrorism and Related perils, but only after receiving Owner's prior confirmation/agreement. Charterers shall reimburse Owners any extra insurance premium incurred.


On completion of discharge of cargo at any port called under this Charter - Charterers to arrange Vessel's departure without delay.
Charterers undertake to hold Owners harmless against any claim which may arise by the receivers' side or any third parties including customs offices and /or local court procedures for shortlanded

cargo, detention and/or arrest thereof, bank guarantees, and/or direct payment of the claimed amount to receivers. Vessel to remain always on-hire.

50. All taxes and dues on the Vessel and/or cargo and on Charterers' hire and on freight all of which arising from cargoes carried to ports visited under the Charter shall be for Charterers' Account.

51.Chamber of shipping nuclear clause and ISPS/MTSA clause for T/C 2005 to be incorporated in this Charter.  All Bills of Lading issued under this Charter to contain Paramount clause, Both-to-Blame Collision clause, General Average clause, New Jason Clause and War Risk Clause.  General average, if any to be settled in accordance with York/Antwerp rules 1994. Charter hire shall not contribute to general average.

52. Charterers are to supply Owners with full style of agents at ports of call and straits before Vessel's arrival.

53. All pilotage(s) expenses to be for Charterers' account.

54. From the date of coming into force of the international safety management (ISM) code in relation to the Vessel and thereafter during the currency of this Charter, the Owners shall procure that both the Vessel and the company (as defined by the ISM code) shall comply with the requirements of the ISM code.

55. CLAUSE PARAMOUNT
CLAUSE PARAMOUNT: THIS BILL OF LADING SHALL BE DEEMED TO INCORPORATE AND BE SUBJECT TO THE CARRIAGE OF GOODS BY SEA ACT OF THE UNITED STATES OF AMERICA AND THE RULES CONTAINED IN THE SCHEDULE ANNEXED TO THE ACT EXCEPT THAT WHEN A CARRIAGE OF GOODS BY SEA ACT OR ORDINANCE OR STATUTE OF A SIMILAR NATURE TO THE "INTERNATIONAL CONVENTION FOR THE UNIFICATION OF CERTAIN RULES RELATING TO BILLS OF LADING" DATED AT BRUSSELS, AUGUST, 1924, IS ADOPTED AND COMES INTO EFFECT IN VENEZUELA THIS BILL OF LADING SHALL BE SUBJECT TO SUCH ACT OR ORDINANCE OR STATUTE AND RULES THERETO ANNEXED AND WHICHEVER IS THE APPLICABLE ACT ORDINANCE, STATUTE AND RULES IS HEREINAFTER CALLED THE CARRIAGE OF GOODS BY SEA ACT. THE VESSEL HER OWNERS, CHARTERERS, OPERATORS AND MASTER SHALL EACH BE INCLUDED IN THE TERM "CARRIER" AS USED IN THE BILL OF LADING. AT ALL TIMES WHEN CARGO IS IN THE CARRIER'S CUSTODY, THE CARRIER SHALL BE ENTITLED TO ALL RIGHTS AND IMMUNITIES AFFORDED TO CARRIERS BY THE CARRIAGE OF GOODS BY SEA ACT AND BY ANY OTHER APPLICABLE STATUTE OR RULE OF LAW FOR THE TIME BEING IN FORCE, ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING. THE CARRIER SHALL NOT BE

LIABLE IN ANY CAPACITY WHATEVER FOR ANY DELAY, NON-DELIVERY, OR MISDELIVERY OR LOSS OF OR DAMAGE TO THE CARGO OCCURRING WHILE THE CARGO IS NOT IN THE CUSTODY OF THE CARRIER. THE CARRIER SHALL HAVE THE LIBERTY TO COMPLY WITH ANY ORDERS OR DIRECTIONS OF ANY GOVERNMENT OR OF ANY PERSON PURPORTING TO ACT WITH THE AUTHORITY OF ANY GOVERNMENT.

56. General average
GENERAL AVERAGE SHALL BE ADJUSTED, STATED AND SETTLED ACCORDING TO THE YORK-ANTWERP RULES, 1974.

57. New Jason Clause
IN THE EVENT OF ACCIDENT, DANGER, DAMAGE OR DISASTER BEFORE OR AFTER COMMENCEMENT OF THE VOYAGE RESULTING FROM ANY CAUSE WHATSOEVER, WHETHER DUE TO NEGLIGENCE OR NOT, FOR WHICH SHIPPER, CONSIGNEES OR OWNERS OF THE GOODS SHALL CONTRIBUTE WITH THE OWNER IN GENERAL AVERAGE TO THE PAYMENT OF ANY SACRIFICES, LOSSES OR EXPENSES OF A GENERAL AVERAGE NATURE THAT MAY BE MADE OR INCURRED AND SHALL PAY SALVAGE AND SPECIAL CHARGES INCURRED IN RESPECT OF THE GOODS. IF A SALVING VESSEL IS OWNED OR OPERATED BY THE OWNER, SALVAGE SHALL BE PAID FOR AS FULLY AS IF SUCH SALVING VESSEL OR VESSELS BELONGED TO STRANGERS. SUCH DEPOSIT AS THE OWNER OR ITS AGENTS MAY DEEM SUFFICIENT TO COVER THE ESTIMATED CONTRIBUTION OF THE GOODS AND ANY SALVAGE AND SPECIAL CHARGES THEREON SHALL, IF REQUIRED, BE MADE BY THE GOODS, SHIPPERS, CONSIGNEES OR OWNERS OF THE GOODS TO OWNER BEFORE DELIVERY.

58. Both-to-Blame Collision Clause
IF THE VESSEL COMES INTO COLLISION WITH ANOTHER VESSEL AS A RESULT OF THE NEGLIGENCE OF THE OTHER VESSEL AND ANY ACT, NEGLECT OR DEFAULT OF THE MASTER, MARINER, PILOT OR THE SERVANTS OF THE VESSEL OR OWNERS IN THE NAVIGATION OR IN THE MANAGEMENT OF THE VESSEL, THE OWNERS OF THE GOODS CARRIED HEREUNDER WILL INDEMNIFY THE VESSEL OR OWNERS AGAINST ALL LOSS OR LIABILITY TO THE OTHER OR NON-CARRYING VESSEL OR HER OWNERS INSOFAR AS SUCH LOSS OR LIABILITY REPRESENTS LOSS OF, OR DAMAGE TO, OR ANY CLAIM WHATSOEVER OF THE OWNERS OF SAID GOODS, PAID OR PAYABLE BY THE OTHER OR NON-CARRYING VESSEL OR HER OWNERS, AS PART OF THEIR CLAIM AGAINST THE CARRYING VESSEL OR OWNER.   THE FOREGOING PROVISION SHALL ALSO APPLY WHERE THE OWNERS, OPERATORS OR THOSE IN CHARGE OF THE VESSEL OR OBJECTS OTHER THAN OR IN ADDITION TO THE COLLIDING VESSELS OR OBJECTS ARE AT FAULT IN RESPECT OF A COLLISION OR CONTACT.

60. Bulk Carrier Safety Clause
(a) The Charterers shall instruct the terminal operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter in respect to loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the Vessel in accordance with the loading/
discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime

61. Intentionally left blank.

62. Intentionally left blank.

63. Intentionally left blank.

64. Intentionally left blank.

65. Owners have the right to sell the Vessel and/or change management of the Vessel and/or change her name and/or her flag at any time during the Charter. Owners may also transfer the remaining period of the Charter to new Owners/Managers subject to Charterers' approval of new Owners/Managers which approval shall not be unreasonably withheld.

66.  The crew to clean holds when and where required by Charterers provided port regulations permit. The crew to receive a lumpsum bonus payment of USD 2,500 per cleaning for this. Otherwise shore labour to be employed for Charterers' account.

67. Ship to Ship Transfer Clause for Time Charter Parties

(a) The Charterers shall have the right to order the Vessel to conduct ship to  ship cargo operations, including the use of barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

(b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Owners shall only provide adequate fendering, securing and mooring equipment, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.

(e) Owners shall provide additional premium quotation, if any, prior to the Ship to Ship Operations, subject to Charterers' approval.  If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

(f) To the extent not covered by Owners' insurance, the Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, or barges; loss of or damage to cargo; and pollution.

68. Notices
Unless otherwise expressly provided for in the Charter, any notice, request or demand by the Owners or the Charterers shall be given in writing in English and shall be deemed to be sufficiently given if delivered by hand or by sending the same by registered post (postage paid) or delivering it to or by sending it by fax to the address or fax numbers of the party concerned as set out below.

(a)    Owners:
       Gretchen Shipping, Inc.
       C/o Kyma Ship Management Inc
       1015 North America Way – Suite #128
       Miami
       Florida 33132
       USA
       Mr. Lambros Katsoufis – President
       Telephone:    +1 305 376 8605
       Facsimile:     +1 305 376 4375
       e-mail: lkatsoufis@kymaship.com

(b)    Charterers:
       Commodities Minerals Enterprise, Ltd.
       501 Brickell Key Dr., Suite 502
       Miami, FL 33131
       Mr. Tyrone Serrao

Phone: +1.305.375.0632
Fax: +1.305.375.0634
Email: ts@emeltd.com

69. Confidentiality

For the duration of the Charter, Owners and Charterers will keep in strict confidence and will not disclose any confidential or proprietary information relating to the Charter, to any person or entity, or make use of any such confidential or proprietary information for its own purposes or for the benefit of any person or entity, except as may be necessary in the ordinary course of performing its respective duties, pursuant to the Charter.

FOR THE OWNERS                    FOR THE CHARTERERS

Secretary
Gretchen Shipping Inc.

01-25-10

IRREVOCABLE LETTER OF CREDIT NO. 63656745

BENEFICIARY:
GRETCHEN SHIPPING INC.
C/O KYMA SHIP MANAGEMENT INC.
1801 S.W. 3RD AVENUE, SUITE 200
MIAMI, FL 33129

APPLICANT:
COMMODITIES AND MINERALS ENTERPRISE LTD.
501 BRICKELL KEY DRIVE, SUITE 502
MIAMI , FL 33131

AMOUNT: USD $2,500,000.00 (USD TWO MILLION FIVE HUNDRED THOUSAND AND 00/100)

DATE OF ISSUE:  JANUARY 28, 2011

DATE AND PLACE OF EXPIRY: JANUARY 28, 2012, AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. 63656745 IN FAVOR OF GRETCHEN SHIPPING INC. FOR AN AGGREGATE SUM NOT TO EXCEED USD $2,500,000.00 (TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 UNITED STATES DOLLARS) (THE 'FACE AMOUNT"). THIS LETTER OF CREDIT IS AVAILABLE BY YOUR DRAFT(S) AT SIGHT DRAWN ON US MENTIONING OUR LETTER OF CREDIT NUMBER INDICATED ABOVE AND ACCOMPANIED BY:

A)    DRAWING FOR INDIVIDUAL CHARTER HIRE

      1.1.  A COPY OF A GRETCHEN SHIPPING INC. INVOICE FOR CHARTER HIRE MARKED "UNPAID".

      2.1.  BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., CERTIFYING THAT THE APPLICANT, COMMODITIES AND MINERALS ENTERPRISE LTD., HAS NOT PAID CHARTER HIRE , DUE ON _____ (INSERT DUE DATE OF PAYMENT) UNDER THE CHARTER AGREEMENT BETWEEN GRETCHEN SHIPPING INC. AND COMMODITIES AND MINERALS ENTERPRISE LTD.;

    OR

B)  ARBITRATION AWARD DRAWING

      1.1.  A COPY OF AN ARBITRATION AWARD AGAINST COMMODITIES AND MINERALS ENTERPRISE LTD. AND IN FAVOR OF GRETCHEN SHIPPING INC.

      2.1.  BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., CERTIFYING THAT THE BENEFICIARY NAMED IN CITIBANK N.A. LETTER OF CREDIT NO. 63656745



EXHIBIT

B

HAS WON AN ARBITRATION AWARD AGAINST THE APPLICANT, COMMODITIES AND MINERALS LTD., ON (DATE OF AWARD) PURSUANT TO DISPUTE RESOLUTION PROSCRIBED UNDER THE CHARTER AGREEMENT BETWEEN GRETCHEN SHIPPING INC. AND COMMODITIES AND MINERALS ENTERPRISE LTD.

OR

C) DRAWINGS FOR NON-EXTENSION OF EXPIRY DATE

1.1.  BENEFICIARY'S STATEMENT PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., STATING "THE AMOUNT CLAIMED IS DUE AND PAYABLE TO BENEFICIARY BECAUSE CITIBANK N.A. ELECTED NOT TO EXTEND THE EXPIRATION DATE OF THEIR STANDBY LETTER OF CREDIT NO. 63656745 AND COMMODITIES AND MINERALS ENTERPRISE LTD HAVE FAILED TO ESTABLISH A NEW STANDBY LETTER OF CREDIT IN THE SAME FORM AND FACE AMOUNT WITH ANOTHER FIRST CLASS INSTITUTION ACCEPTABLE TO BENEFICIARY 30 DAYS PRIOR TO THE EXPIRATION DATE OF THIS LETTER OF CREDIT."

OR

D) DRAWING FOR NON-REINSTATEMENT OF THE AVAILABLE AMOUNT OF LETTER OF CREDIT

1.1.  BENEFICIARY'S STATEMENT PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC. CERTIFYING THAT (I)  THERE HAVE BEEN 2 CONSECUTIVE DRAWS UNDER THE LETTER OF CREDIT AND (II) THE LETTER OF CREDIT IS NOT REINSTATED TO THE FACE AMOUNT OF LETTER OF CREDIT.

ADDITIONAL CONDITIONS

PARTIAL DRAWINGS UNDER THIS LETTER OF CREDIT ARE ALLOWED, HOWEVER, THE AVAILABLE AMOUNT UNDER THIS LETTER OF CREDIT WILL BE THE FACE AMOUNT DECREASED BY ANY PAYMENTS MADE UNDER THIS LETTER OF CREDIT PLUS ANY AMOUNT OF INCREASE MADE BY AN AMENDMENT.

SUCH DRAWINGS FOR INDIVIDUAL CHARTER HIRE MAY NOT BE MADE WITHIN 15 CALENDAR DAYS FROM ANY PREVIOUS DRAWING DATE.

DRAWING(S) AS REQUESTED UNDER B) OR C) OR D) OF THIS LETTER OF CREDIT MAY BE MADE FOR THE THEN AVAILABLE AMOUNT UNDER THIS LETTER OF CREDIT.

IT IS A CONDITION OF THIS STANDBY LETTER OF CREDIT THAT ITS EXPIRY DATE SHALL BE AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ONE (1) YEAR PERIODS FROM THE PRESENT OR ANY FUTURE EXPIRATION DATE, NOT BEYOND ITS FINAL EXPIRATION DATE OF APRIL 12, 2015 UNLESS WE SHALL NOTIFY BENEFICIARY AT LEAST 60 DAYS PRIOR TO SUCH EXPIRATION DATE, BY COURIER,

THAT WE HAVE ELECTED NOT TO EXTEND EXPIRY DATE OF THIS LETTER OF CREDIT FOR ANY SUCH ADDITIONAL PERIOD.

THIS LETTER OF CREDIT WILL TERMINATE ON EARLIER OF (I) FINAL DRAWING REDUCING THE AMOUNT OF LETTER OF CREDIT TO ZERO OR (II)  JANUARY  28, 2012 OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

BANKING CHARGES OTHER THAN THE ISSUING BANK ARE FOR THE BENEFICIARY'S ACCOUNT.

WE HEREBY AGREE WITH YOU THAT DRAFTS DRAWN IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT WILL BE DULY HONORED ON DUE PRESENTATION IF PRESENTED ON OR BEFORE THE EXPIRATION DATE OR ANY AUTOMATICALL EXTENDED EXPIRY DATE.

UPON RECEIPT OF DOCUMENTS IN ORDER, WE WILL PAY IN ACCORDANCE WITH YOUR INSTRUCTIONS.

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590, AND AS TO MATTERS NOT ADDRESSED BY THE ISP98, SHALL BE GOVERNED BY AND CONSTRUED  IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE U.S. FEDERAL LAW.

REMIT DOCUMENTS BY COURIER TO:  CITIBANK N.A., C/O ITS SERVICER CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, ATTN: U.S. STANDBY DEPT.

AUTHORIZED SIGNATURE(S)
CITIBANK N.A.

Begin forwarded message:
**From:** Paris Katsoufis <pkatsoufis@mac.com>
**Date:** December 11, 2009 11:43:10 AM EST
**To:** Stefanos Skyriotis <sskyriotis@kymaship.com>, George Katsoufis <gkatsoufis@kymaship.com>, Mark Davis <mdavis@kymaship.com>, Lambros Katsoufis <lkatsoufis@kymaship.com>
**Cc:** Arturo Contreras <ac@cmeltd.com>, Tyrone Serrao <ts@cmeltd.com>
**Subject: Re: m.v Christoffer Oldendorff visit I2/9/09**


Dear All,

On Dec 9,2009 Arturo and I visited the captioned vessel,lying at the Blount Island marine terminal of the port of Jacksonville.

The vessel was unloading abt 40,000 tons of coal from Colombia.
We followed the discharging operation steps throughout the vessel with the guidance of Ch.Mate capt.  Ravil Aksyanov( a very well versed to the operation  Russian officer) who  answered all our questions.
This is a very well thought design which enables the vessel to discharge abt 4,500 M/T iron ore or 4,400 M/T of coal per hour.The operation was seamless and fast without almost any trace of dust or spill over.
This is  a vessel  inside the old vessel which has 222 hydraulic basket gates feeding 3 hold conveyors of 1500 MT max handling capacity each per hour.The three conveyors feed the boom conveyor capable of unloading the quantities mentioned  above. The bottom of  of the holds is constructed wavy like a hopper, therefore  the cargo slides down to the conveyors. In the unlikely event that moisture will stick the cargo not allowing it  to slide down easily, they have added 151 hydraulic vibrators attached to the under side of  the hopper-like bottom of the holds,guaranteeing the complete discharge of the cargo.
The vessel's characteristics and her vital statistics are as attached.

The condition of the vessel was much better than her age implies. The engine room was very clean ,her bilges were very clean,probably the cleanest bilges  of any ship I have seen. The reason for such a condition should be sought to the fact that the owners are a German company,the vessel visits very often the United States  and therefore is" under the gun" of U.S. Coast Guard and more importantly the  crew is serving onboard for many years.the Chief Engineer Mr.Marek Golanko from Poland is with the company for 15 years.He is proud of his engines and takes special care of them and it shows.

The vessel is equipped with 5 generators that are used for both the vessel and the self unloading system. The F.O for the M.E is 380 CST while the generators are consuming Marine Diesel. The consumption for the M.E at Sea is abt 37 tons HFO and 3,3 MT D.O, while in port, with  the whole system  fully operative the



consumption 7,5 MT.

The incinerator is capable of burning sludge and therefore they do not need to unload anything ashore including garbage.

The fresh water generator is of the vacuum type using the jacket cooling water. Its capacity is not more than 16 tons a day. The C.E when asked what he would need to have in this ship he said another water evaporator or reverse Osmosis since the quantity produced is not enough to take care of all the requirements. They wash the conveyors and the boom with fresh water whenever they change cargo as this time they may load salt.

The vessel is equipped with a KAMEWA bow thruster of 1400 BHP,which makes the berthing operation safer, easier and less expensive.

The Engine room is of  the unmanned configuration but the C.E has a motorman at night on watch for safety reasons. They had probably an accident and decided to be at the safe side.

The C.E did not report any problem in the  Engine room,which I find rather strange considering the age of the vessel.He may be telling the truth.

The upper deck is well painted and seems to be well maintained for a vessel of 27 years of age. to the contrary,the condition of the inner spaces, holds, conveyors ,Hydraulic basket gates,hold stair cases etc  needs better maintenance.

The vessel has a crew or 35 crew members since at least 10 crew members are involved in the operation and maintenance of the unloading system. Recently they  released the Chief Mate of watch duties and they have added a 2nd officer for the Chief mates watch.
The hatch covers are side sliding hydraulically.

The vessel was, last year, in drydock or wet dock for 3 months or so the Captain advised us. The reason,  of this long out of service period,was the age of the vessel and the sensitivity of the authorities to overaged vessels.One LLoyd's surveyor was onboard for the whole duration indicating continuously areas of concern and required repairs.
This is the reason that I am of the opinion to try and buy her" as is" and take her to the dry dock to complete her special survey which is due in March latest,or all the items of the Continuous Machinery survey which are due either in Feb or Sept.2010 .
The Master,Capt Sergiy Rulevsky ,a Ukranian, was very knowledgeable of his business but he denied to work for us in case we were to buy this vessel.

I believe that this is a good tool under the circumstances.

The high amount of insurance premium quoted  is of concern but we hope that the underwriters after they inspect the vessel they will reaffirm my opinion on vessel's condition and they will reduce their demands swayed in a way by our good record.

Additionally ,of concern is the state of affairs in Venezuela and the unilateral decisions of its government.

I plan to discuss this with our charterers and take a common course of action.


Best Regards
Paris Katsoufis

# CHRISTOFFER OLDENDORFF



*The Christoffer Oldendorff uses her articulated boom
to discharge coal.*

| | |
|---|---|
| Built | 1982 |
| Classification | Lloyds +100 A1 |
| Length Overall | 227.72 metres |
| Breadth Moulded | 32.23 metres |
| Depth Moulded | 19.20 metres |
| Total Hold Capacity (including hatches) | 59,703.60 cubic metres |
| Deadweight | 62,594 tonnes |
| Draft | 13.49 metres |
| Gross Tonnage | 37,959 tonnes |
| Net Tonnage | 16,736 tonnes |
| Bow Thruster | 1250 kW |
| Length of Boom | 77.00 metres |
| Discharge Rate | -Coal ... 2,900 tonnes/hr |
| | -Ore ... 3,000 tonnes/hr |



EXHIBIT

D



CSL
INTERNATIONAL

**CHRISTOFFER OLDENDORFF**





## Air Drafts (metres)

| Draft Condition | Stem | Foremast | Hatches Forward | Hatches Midship | Hatches Aft | Cargo Gear | Main Mast Deployed | Main Mast Lowered | Funnel | Stern | Other Obstruction | Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Keel | 22.5 | 34.00 | 21.80 | 21.80 | 21.40 | 30.30 | 50.05 | N/A | 42.25 | 19.2 | N/A | 48.7 |
| Light Ship | 21.5 | 32.90 | 20.80 | 18.80 | 17.40 | 27.10 | 43.90 | N/A | 37.2 | 13.9 | N/A | 43.9 |
| Normal Ballast 50% Bunker | 15.2 | 26.60 | 14.40 | 18.70 | 13.00 | 21.80 | 39.40 | N/A | 33.0 | 9.7 | N/A | 39.4 |
| Fully Loaded 50% Bunker | 9.9 | 20.50 | 8.50 | 8.50 | 8.10 | 16.80 | 35.20 | N/A | 29.0 | 5.7 | N/A | 35.2 |

## Hatch and Hold Specifications

| Hold Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Hold Volumes** (cubic metres) | | | | | | | | |
| Cubic | 7,123.8 | 9,223.7 | 9,277.3 | 9,020.7 | 8,941.6 | 9,223.6 | 5,139.1 | 57,949.8 |
| Maximum Grain | 7,333.7 | 9,517.7 | 9,571.4 | 9,314.8 | 9,235.7 | 9,517.7 | 5,212.6 | 59,703.6 |
| Grain in way of Hatch | 209.9 | 294.1 | 294.1 | 294.1 | 294.1 | 294.1 | 73.5 | 1,753.9 |
| **Hold Openings** (metres) | | | | | | | | |
| Number of Openings | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 |
| Opening Length | 12.88 | 12.88 | 12.88 | 12.88 | 12.88 | 12.88 | 5.80 | |
| Opening Width | 10.00 | 13.60 | 13.60 | 13.60 | 13.60 | 13.60 | 13.60 | |
| Coaming Height above Keel | 21.20 | 21.20 | 21.20 | 21.20 | 21.20 | 21.20 | 20.52 | |
| **Hatch Information** (metres) | | | | | | | | |
| Description | Steel Side rolling | Steel Side rolling | Steel Side rolling | Steel Side rolling | Steel Side rolling | Steel Side rolling | Steel Side rolling | |
| Operation | Hydraulic | Hydraulic | Hydraulic | Hydraulic | Hydraulic | Hydraulic | Hydraulic | |
| Hatch Length | 14.40 | 14.40 | 14.40 | 14.40 | 14.40 | 14.40 | 7.19 | |
| Hatch Width | 10.80 | 15.12 | 15.12 | 15.12 | 15.12 | 15.12 | 15.12 | |
| Hatch Top Height above Keel | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 21.13 | |

## Cargo Handling Equipment

- Consilium Equipment consisting of three hold conveyors, two short cross conveyors, two lift conveyors and one double-articulated boom conveyor, which is not integrated into the superstructure. Weight of boom conveyor is 285 tonnes.
- Dust Suppression: Water Spray
- Unloader Boom Length: 77.00 metres
- Discharge Rate - Coal:   2,900 tonnes/hr
  - Ore:   3,000 tonnes/hr
- Maximum Boom Outreach: 60.88 metres

## Consumption (tonnes per day)

| | Speed Loaded | Speed Ballast | Main Engine IFO | Generators MDO |
|---|---|---|---|---|
| Sea | 13.5 knots | 14 knots | 37 | 2.5 |
| Port / Anchorage | | | 1 | 3 |
| Loading / Discharge | | | 1 | 6 |

*For more information on this ship please visit*
www.cslint.com



**CSL**
INTERNATIONAL

# CHRISTOFFER OLDENDORFF



## DEADWEIGHT SCALE

| DRAFT | | | | DISPLACEMENT | TPC | DEADWEIGHT | DRAFT | |
|---|---|---|---|---|---|---|---|---|
| Sea Water | | Fresh Water | | | | | Sea Water | |
| (metre) | (feet) | (metre) | (feet) | (tonnes) | (tonnes) | (tonnes) | (feet) | (metre) |

### ASSIGNED DRAFTS

| Season | Draft (metre) | Displ. (tonnes) | DWT (tonnes) |
|---|---|---|---|
| TF | 14.08 | 80,695 | 64,347 |
| F | 13.80 | 78,947 | 62,599 |
| T | 13.77 | 80,729 | 64,381 |
| S | 13.49 | 78,942 | 62,594 |
| W | 13.21 | 77,163 | 60,815 |

DECK LINE

4.479 Metres

Light Ship
16,363 tonnes

0981-04  08/17/04


CSL
INTERNATIONAL

*For more information on this ship please visit*
*www.cslint.com*

CSL International, Inc. • 152 Conant Street, Beverly, MA, U.S.A., 01915 • Tel.: 978-922-1300 • Fax: 978-922-1772 • info@cslint.com • www.cslint.com

*All specifications given in good faith but without guarantee*



# Vessel's Particulars
Reference: ER-Part-09

**Oldendorff Carriers**

| Name of Vessel | Official No. | Call Sign | IMO Number |
|---|---|---|---|
| CHRISTOFFER OLDENDORFF | 90340 | ELXC8 | 8011782 |

| Flag | Port of Registry | Classification | Classification Number |
|---|---|---|---|
| LIBERIA | MONROVIA | LLOYD'S REGISTER OF SHIPPING | 8011782 |

| Owner | Manager/ Operator | Character of Class | |
|---|---|---|---|
| | | **Hull** | **Machinery** |
| OLDENDORFF CARRIERS GmbH & Co. KG | CSL INTERNATIONAL / ARUBA MARITIME INC. | + 100A1 ESP LI | + LMC UMS |

| Type of Vessel | Year, Number of Built | Yard of Built |
|---|---|---|
| SELF-UNLOADING BULK CARRIER | 1982/NO. 253 1988 (CONVERTED) | GOVAN SHIPBUILDERS LTD. GLASGOW SCOTLAND VEROLME ESTALEIROS REUNIDOS RIO DE JANEIRO BRAZIL |

| Length o.a. | Length b.p. | Beam | Depth moulded | max. Draft |
|---|---|---|---|---|
| 227.73 m (747'02") | 214.50 m (703'09") | 32.23 m (105'09") | 19247 m (63'02") | 13.498 m summer (44'03") |

| Freeboard | Masthead Height a. Keel | Gross Tonnage | Net Tonnage |
|---|---|---|---|
| 5.759 m (summer) | 48.7 m (159'09")above BL | 37,959 MT | 16,733 MT |

| Deadweight | Light Ship | Displacement | Holds | Crew |
|---|---|---|---|---|
| 62,594 mt (summer) | 16,348 mt | 78,942 mt (summer) | 7 | 36 |

| | Container | | Loading Capacity | |
|---|---|---|---|---|
| **Below Deck** | **On Deck** | **Reefer** | **Grain** | **Bale** |
| N/A TEU | N/A TEU | N/A TEU | 59,703.6 cbm (2,108,412 cft) | 57,899.8 Cbm (2,044,712 cft) |

| Main Engines | | Aux. Generator Diesels | |
|---|---|---|---|
| **Number, Output** | **Type** | **Number, Output** | **Type** |
| (1) Engine  15,400 BHP (11,400 Kw) | B & W 5l 80GFCA | 3 X 880 Kw 2 X 625 Kw | ALLEN S12F-HBC YANMAR 6GL-UT |

| Propeller | | Shaft Generator | |
|---|---|---|---|
| **Number, Type** | **Diameter** | **Number, Output** | **Type** |
| NIKALIUM FIXED 4 BLADE RIGHT HANDED | DIAMETER6.80 m PITCH 4.62 m | N/A | N/A |

| Bow Thruster | | Speed | |
|---|---|---|---|
| **Number, Output** | **Type** | **Service** | **Maximum** |
| 1,400 BHP | KAMEWA TT 2000 F/BMS-CP | 13.5 kn | 14.5 kn |

## Nautical Equipment

1 X- BAND RADAR TOKIMEC BR-340 MA-X27
1 S- BAND RADAR TOKIMEC BR-3440 MA-S314
1 GYRO COMPASS SPERRY MK-37 / AUTO PILOT
1 MAGNET COMPASS SESTREL 90624
1 GPS FURUNO GP-90
1 GPS FURUNO GP- 80
1 AIS UNIT Furuno FA- 100
1 SPEED LOG FURUNO DS-80
1 WEATHER FACSIMILE FURUNO FAX-207
1 NAVTEX-2 LO-KATA
1 COURSE RECORDER TOKIMEC CR - 2
1 CHRONOMETER KELVIN HUGHES
1 ECHO SOUNDER SIMRAD ED 161

2 VHF  Sailor  C403
2 VHF Sailor  RM 2048
2 VHF DSC Sailor 2042
1 HF SSB/ DSC Station Furuno FS2571-C
1 RADIO TELEX TERMINAL Furuno IB583
1 INMARSAT –C  TERMINAL SAILOR
1 INMARSAT- B Terminal Nera ( Saturn B )
1 GYRO DIGITAL REPEATER  AD converter AD 100
1 CHARTCO
1 SVDR Rutter Canada
  MMSI  636090340
Mini-C Sailor TT-3000LRIT
Inmarsat C: Telex: 4636 37010,
        C- email: 463637010@stratosmobile.net
Inmarsat B:  Tel.: + 3636 17410,  3636 17411
        Fax:  + 3636 17420
        E-mail: christoffer.oldendorff@gtships.com

| Fo-GO-11a | Revision 10 | 01.10.2007 | Filing: ER-Manual Part 9 | Page 1 of 2 |
|---|---|---|---|---|



| | **Vessel's Particulars**<br>Reference: ER-Part-09 | **Oldendorff Carriers** |
|---|---|---|

| **Miscellaneous** |
|---|
| e.g. Grain Capacity cbm, Reefer Capacity cbf, Dangerous Goods, Elevators, Shell Doors, Cargo Gear, Cranes, Selfunloader, Fork Lifts, |

## Self-unloading Bulk Carrier

1. *Hydraulic Basket Gates- 222 pcs. Under hoper openings 630X1900mm*

2. *Hydraulic Vibrators –151 pcs. Max.centrifugal force: 1,360 kp,4,200 r/m*

3. *Hold Conveyors: max handling capacity 1500 MT(iron ore) or 1,500 cu. M. (coal) each belt-width 2,200 mm, conveyor length169 m,lifting height 4200 mm, min./max. belt speed 0.32/ 1.77 m/s, power req.: on pulley shaft 62.5 kW.*

4. *2 Cross Conveyors: max. Handling Capacity 1,500 MT (iron Ore) Or 1,500 Cu. M. (coal) each belt –width 1,800 mm, conveyor length 5.4 m. min. / max. belt speed 0.4 / 2.1 m/s, power req.: on pulley shaft 4.3 kW.*

5. *2 Flexo-Lift Inner Conveyors: max. handling capacity 2,250 MT (iron ore) or 2,200 cu. M. (coal) each belt –width 2,000 mm., effective carry width 1,200 mm, height sidewalls 500 mm lifting height 31.7 m, min. / max. belt speed 2.0/3.5 m/s, power req.: on pulley shaft 262.62 kW.*

6. *1 Inboard and 1 Outboard Boom Conveyor: max. handling capacity 4,500 MT (iron ore) or 4,400 cu. m. (coal), conveyor length: Inboard boom 46.2 m, Outboard Boom 31.8 m, Luffing range:18deg. Min /max belt speed 2.5 / 4.8 m/s, Luffing speed:18 deg/10 min. Inboard Boom and 18deg./5 min Outboard Boom.,power req.: on Pulley shaft 210.5 kW Inboard Boom and 158.8 kW Outboard Boom.*

## *Cargo Hold Capacity*

| | | Hold and Hatches | | Holds | |
|---|---|---|---|---|---|
| Hold #1 | | 7,333.7 cu. m. | 259,001 cu. ft. | 7,123.8 cu. m. | 251,588 cu. ft |
| Hold #2 | | 9,517.7 cu. m. | 336,133 cu. ft. | 9,223.7 cu. m. | 325,750 cu. ft. |
| Hold #³ | | 9,571.4 cu. m. | 338,029 cu. ft. | 9,277.3 cu. m. | 327,643 cu. ft. |
| Hold #4 | | 9,314.8 cu. m. | 328,967 cu. ft | 9,020.7 cu. m. | 318,580 cu. ft. |
| Hold #5 | | 9,235.7 cu. m. | 326,174 cu. ft. | 8,941.6 cu. m. | 315,787 cu. ft. |
| Hold #6 | | 9,517.7 cu. m. | 336,133 cu. ft | 9,223.6 cu. m. | 325,746 cu. ft. |
| Hold #7 | | 5,212.6 cu. m. | 184,091 cu. ft. | 5,139.1 cu. m. | 181,496 cu. ft. |
| | Total: | 59,703.6 cu. m. | 2,108,528 cu. ft | 57,949.8 cu. m. | 2,046,590 cu. ft. |

## **Class Notification:**

+100A1  **Bulk Carrier**
**Self-Unloading**
**Strengthened for heavy cargoes,**
**Nos. 1,3,5 and 7 holds or Nos. 2,4 and 6 holds may be empty at a draft not exceeding 10.4 meters.**
**Cargo in Holds 1,2,3,4,5,6 and 7 not to exceed 9,100/11,600/11,600/11,300/ 11,200/11,600 and 7,500 tonnes respectively.**
**ESP LI**
+LMC UMS

This information provided in this QSE form is believed to be correct but we do not guarantee its completeness or accuracy.

M/V Christoffer Oldendorff
Aruba Maritime Inc
Monrovia/Liberia

| **Date:**<br>08.12.2009 | **Signature Master:** | |
|---|---|---|

| Fo-GO-11a | Revision 10 | 01.10.2007 | Filing: ER-Manual Part 9 | Page 2 of 2 |
|---|---|---|---|---|